GIRARD TRUST COMPANY AND W. NELSON L. WEST, EXECUTORS OF THE ESTATE OF IDA SIMPSON, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87978. Promulgated January 24, 1940.

*E. F. Colladay, Esq., D. C. Colladay, Esq.,* and *Wilton H. Wallace, Esq.,* for the petitioners.

*William A. Schmitt, Esq.,* for the respondent.

OPINION.

HILL: Respondent determined a deficiency in the Federal estate tax liability of petitioners in the amount of $17,847.78. The issue is whether or not respondent erred in disallowing as a deduction from the value of the gross estate bequests in the aggregate sum of $131,-507.72 to corporations or other organizations specified in section

303 (a)(3) of the Revenue Act of 1926,[1] which disallowance was based upon respondent's holding that the Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church was not a corporation organized and operated exclusively for religious, educational, or other purposes stated in the cited statute.

Petitioners are executors of the estate of Ida Simpson, deceased, late of the city of Philadelphia, Pennsylvania, who died testate October 29, 1933. In her last will and testament decedent, after . making certain special bequests, gave the remainder of her estate to trustees for the purposes and subject to the powers and limitations therein stated. Decedent's will provided in paragraph III as follows:

A. Should my beloved sister, Sarah Elizabeth Simpson, survive me, I direct that the entire net income from the said residuary trust shall be paid to her during her life.

B. Upon her death, or upon my death, should I survive her, the principal shall be paid over by my Trustees to the following charitable institutions in the following amounts and proportions, provided however, that should my sister, Sarah Elizabeth Simpson, survive me, I direct that she shall have a limited power of appointment to readjust the amounts and/or proportions passing to each charity in such manner as she, by her last Will and Testament, may deem advisable, and subject to her said power I direct that payments shall be made as follows:

The special bequests then set forth in decedent's will included the following:

| | |
|---|---|
| Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church | $50,000 |
| Simpson Memorial Church at Long Branch, New Jersey | 1,000 |
| Methodist Episcopal Hospital of Philadelphia | 25,000 |
| Arch Street Methodist Episcopal Church, Philadelphia | 5,000 |
| Church of the Covenant, Philadelphia | 5,000 |
| Emma L. Simpson Memorial Methodist Episcopal Church, Paoli, Pennsylvania | 5,000 |
| St. George's Methodist Episcopal Church, Philadelphia | 5,000 |
| Pennington Seminary, Pennington, New Jersey | 5,000 |
| Monte Mario College, Rome, Italy | 5,000 |
| Women's Foreign Missionary Society of the Philadelphia Conference of the Methodist Episcopal Church | 5,000 |
| Women's Home Missionary Society of the Philadelphia Conference of the Methodist Episcopal Church | 5,000 |
| Methodist Episcopal Orphanage in Philadelphia | 500 |
| Methodist Episcopal Home for the Aged in Philadelphia | 500 |
| | $117,000 |

---

[1] SEC. 303. For the purpose of the tax the value of the net estate shall be determined—

(a) In the case of a resident, by deducting from the value of the gross estate—

\* \* \* \* \* \* \*

(3) The amount of all bequests, legacies, devises, or transfers, \* \* \* to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, \* \* \* no part of the net earnings of which inures to the benefit of any private stockholder or individual \* \* \*.

In addition to the foregoing bequests decedent in her will gave $5,000 to the retired ministers' fund or Board of Pensions and Relief of the Methodist Episcopal Church, which item does not appear to be involved in the present controversy and no further reference will be made thereto.

The residue of the trust estate decedent gave in equal portions to Simpson College, Indianola, Iowa, the Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church, and American University, Washington, D. C. In the estate tax return a deduction was claimed in the amount of $131,507.72 on account of the foregoing bequests, thus valuing the residue of the estate at $14,507.72.

Respondent denied the deduction for the reason that, as stated in the notice of deficiency, decedent's sister was given a power of appointment to readjust the amount or proportion to be given to each organization, and one of such organizations, the Board of Temperance, Prohibition and Public Morals, did not come within the provisions of section 303 (a) (3), *supra*.

The bequests above mentioned, other than those involving the residue of the estate, have been paid in cash in the sums stated. The parties have stipulated that the residue of the estate will be paid at the termination of the instant proceeding. The parties have further stipulated that each institution above referred to, with the exception of the Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church, qualifies under section 303 (a) (3), *supra*, as a religious, charitable or educational corporation.

Sarah Elizabeth Simpson, the surviving sister of petitioners' decedent, was born in November 1853 and died February 29, 1936.

Section 303 (c) (3) of the 1926 Act, *supra*, was amended by section 406 of the Revenue Act of 1934 by inserting after the word "individual" the following: "and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." Petitioners argue that, since their decedent died in 1933 prior to enactment of the Revenue Act of 1934, the quoted amendment to the 1926 Act has no application in this case. They contend, however, that irrespective of the holding on this point, the Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church, hereinafter for convenience sometimes called Methodist Board or Board of Temperance, qualified under the statute so that the amount of any bequest in decedent's will is deductible for purposes of estate tax. Respondent says the amendment is merely a clarifying provision, interpretative of the earlier statute and intended to give legislative approval to a long continued administrative construction. See G. C. M. 19715, C. B. 1938–1, p. 499.

An extended discussion here is unnecessary. It is clear, we think, that any corporation, a substantial part of whose activities is participating in partisan politics or in carrying on propaganda or otherwise attempting to influence legislation, does not come within any of the classes described in section 303 (a) (3), *supra.* Cf. Senate Finance Committee's Report on the Revenue Bill of 1934, sec. 406. The same view has long been taken by the courts. In *Slee* v. *Commissioner* (C. C. A., 2d Cir., 1930), 42 Fed. (2d) 184, which arose under the Revenue Acts of 1924 and 1926 prior to the amendment of the latter, the court said:

Political agitation as such is outside the statute, however innocent the aim, though it adds nothing to dub it "propaganda", a polemical word used to decry the publicity of the other side. Controversies of that sort must be conducted without public subvention; the Treasury stands aside from them. * * * it is not in our judgment one of those purposes which Congress meant to assist.

To make the bequests to the Methodist Board here in controversy allowable as a deduction, it must appear that the Board not only was organized but also was operated *exclusively* for one or more of the purposes specified in the statute. Cf. *George O. May*, 1 B. T. A. 1220; *Herbert E. Fales*, 9 B. T. A. 828; *Joseph M. Price*, 12 B. T. A. 1186: And we may add to this statement that if it appears that a substantial part of the Methodist Board's activities was carrying on propaganda or otherwise attempting to influence legislation, it was not organized and operated *exclusively* for any of the statutory purposes. Other qualifications provided in the statute are not in question here. What then does the record disclose concerning the purposes of the Methodist Board's organization and the manner of its operations?

The Board of Temperance was organized pursuant to authorization of the general conference of the Methodist Episcopal Church meeting in Baltimore, Maryland, in 1908. It was subsequently incorporated on April 27, 1917, under the laws of the District of Columbia. The purposes for which it was organized were stated in its certificates of incorporation as follows:

To promote the cause of temperance by every legitimate means; to prevent the improper use of drugs and narcotics; to render aid to such causes as in the judgment of the board of trustees, tend to advance the public welfare.

The general conference is the law-making body of the Methodist Episcopal Church, and also its "supreme court." The Board of Temperance exists under and pursuant to the "Discipline" of the church. The general conference meets every four years, one of such meetings having been held in 1932. Paragraph 478 of the "Discipline" of the Methodist Episcopal Church of 1932, under which the Board of Temperance was operating at the date of decedent's death, provided that

the board should "work under the following Constitution", in article I of which it was stated that:

The object of this Board is to promote voluntary total abstinence from all intoxicants and narcotics, to promote observance and enforcement of all constitutional provisions and statutory enactments that suppress the liquor traffic and the traffic in narcotic drugs, to promote the speedy enactment of such legislation throughout the world.

Article IV of the board's constitution provided that it should be the duty of the Board of Managers, among other things, to represent the church officially in every wise movement for the promotion of total abstinence and the securing of legal prohibition of the liquor traffic; to devise such plans and make such advices as would "enable the Church most successfully to compass the overthrow of that great foe of society, the legalized liquor traffic"; and to make such use of the money paid into its treasury as the work might demand.

The Board of Temperance issues a monthly publication called "The Voice", which has a circulation of about 67,000 copies, largely among ministers, Sunday school superintendents and others engaged in religious work. The board issues another monthly called "The Clip Sheet", with a circulation of about 7,000. It is sent largely to community and religious papers and to editors of other publications. The board also issues various pamphlets from time to time and has books published and distributed by the Methodist Book Concern, which is owned by the Methodist Episcopal Church.

The Methodist Board of Temperance actively participated in the presidential campaign of 1928, advocating the election of certain political party candidates for president and vice president and opposing the election of the candidates of another political party for the same offices. In the nineteenth annual report of the general secretary of the board at its annual meeting held in Washington, D. C., on December 4, 1928, it was stated: "we had to use all the energy and the planning we were capable of in bringing about the election of" (certain candidates named therein for president and vice president).

The May 1936 issue of the Voice contained the following statement:

One of the most deserving bills now before the House of Representatives is H. R. 9495 introduced by Mr. Dobbins and referred to the Committee on the Post Office and Post Roads * * *. Letters in behalf of this bill will serve a most useful purpose.

The following excerpts are from an article by the executive secretary of the board, appearing in the January 1933 issue of the Voice:

Every dry voter who voted for the victorious party should now write or wire his new Congressman: "We voted for you, not for liquor. We want bread not

## 162

beer, we want relief not repeal. We were voting for work and wages, not for brewers and bar-tenders."

\* \* \* \* \* \* \*

If we could have had Mr. _____ head an independent movement early enough to get a swinging start this year, we would have had the wets divided about equally in the two parties that betrayed us and we would have had a good fighting chance to win, for we would have concentrated the dry votes, easily in the majority, into one party and let the wets divide, \* \* \*

Don't any one get alarmed. This is not the advocacy of a third party. It advocates making a party that stands for civic righteousness, the restoration of prohibition, the punishment of the speculators who fleeced the American people of their savings and shipped them out of the country, and the rescuing of the poor who are the victims of the rich man's greed, and the making of such a party number one, instead of third.

\* \* \* \* \* \* \*

We will organize to canvas our communities to see that both men and women register as a sacred duty. We will tell them that the election to office of a wet nullifier anywhere is the peril of moral reform and of all good government.

\* \* \* \* \* \* \*

\* \* \* Mr. Pickett (Research Secretary of the Board) attended the National Democratic convention and succeeded in getting a line on those who were betraying the people of the United States and their record and speeches and we will know the trustworthy from the untrustworthy leaders hereafter. \* \* \*

Also in the January 1933 issue of the Voice, in an article by Pickett discussing proposed legislation by Congress relative to the sale of beer, is the following statement: "This Board was represented in the House hearings and has earnestly opposed the wet program."

In the Voice of March 1933 appears the following:

Get in touch with your Congressman. If he is a holdover Congressman, commend him if he has been voting right; rebuke him if he has been voting wrong. Whatever you say, say with consideration and charity. Votes are not won by abuse.

Have your congregation pass a resolution and send it to your Congressman. Inspire every personal letter you can to representatives and senators. Let them realize the extent and power of prohibition sentiment. Let's do it now.

The August 1933 issue of the Voice, discussing the question of repeal of the Prohibition Amendment, contains the following statements:

There is still plenty of time to win this fight, but are we going to do it? Where is the picturesque and inspiring character who will bring these lurking voters to the polls? \* \* \*

\* \* \* \* \* \* \*

\* \* \* We urged a dry vote on legislators and Congressmen.

In the November 1933 issue of the Voice, in an article entitled "The Board of Temperance Reorganizes and Moves Forward," appears the following:

The activities of our Board have largely been centered upon government and law but we must now make a new approach to the age-old problem of alcoholism.

The record contains much additional evidence, largely cumulative, which we deem it unnecessary to set forth in detail here. The foregoing is sufficient to demonstrate that a substantial part of the activities of the board, both prior, during, and subsequent to 1933, the year of decedent's death, consisted of carrying on propaganda to influence legislation.

From this evidence we find that, at the time of the death of the decedent, Ida Simpson, the Board of Temperance, Prohibition and Public Morals of the Methodist Episcopal Church was not operated exclusively for religious, charitable, scientific, literary, or educational purposes within the meaning of section 303 (a) (3) of the Revenue Act of 1926.

The board advocated the enactment of laws to suppress the liquor traffic, and extensively carried on propaganda in opposition to the repeal of such legislation. However commendable its purposes may be regarded—and we here of course intimate no opinion in that connection, we think the board's activities were such as clearly to prevent its classification as a corporation organized and operated *exclusively* for religious, charitable, or educational purposes. It is not contended that it comes within any other classification stated in the statute. That a large part, perhaps a major part, of the Methodist board's activities were admittedly religious, charitable, or educational, does not help petitioners if, as we are impelled in the light of the evidence to hold, it was engaged to a substantial extent in other activities.

The activities of the Methodist Board in advocating the enactment, and opposing the repeal, of prohibition legislation were not exclusively educational, but were essentially within the recognized field of political advocacy; and such activities plainly were not mediate or ancillary to the board's primary purpose; on the contrary, they constituted one of its primary and apparently most important purposes. Cf. *Slee* v. *Commissioner, supra; Henriette T. Noyes,* 31 B. T. A. 121, 123; *Leubuscher* v. *Commissioner,* 54 Fed. (2d) 998.

In *John H. Watson, Jr.,* 27 B. T. A. 463, we held that the activities of an organization which made researches and investigations with respect to civic, social, and economic problems and as to the qualification of candidates for office, disseminated the results in bulletins sent to its members and in newspapers, and when considered desirable advocated the amendment of existing laws, went beyond the scope of education and entered the field of advocacy. See also *James J. Forstall,* 29 B. T. A. 428.

The *Noyes* case, *supra,* held that an association which was organized and operated for educational purposes but also participated in urging the appropriation of Government funds for particular purposes, the adoption or rejection of certain bills, including the adoption of a

system of prohibition enforcement, was not within the statute exempting donations to it from tax.

In *Slee* v. *Commissioner, supra,* the court held that donations to a corporation organized, among other things, to enlist the support and cooperation of legislators in effecting the lawful repeal and amendment of state and Federal statutes dealing with the prevention of conception, were not deductible, saying that such associations "are indistinguishable from societies to promote or defeat prohibition, to adhere to the League of Nations, to increase the Navy, or any other of the many causes in which ardent persons engage."

It is immaterial, we think, that the Board of Temperance involved here was organized by the Methodist Episcopal Church, which, it can not be doubted, is engaged in religious, charitable, or educational work directly and through subsidiary organizations. The question we are called upon to decide is whether or not its Board of Temperance was organized and operated *exclusively* for religious, charitable, or educational purposes. Under the evidence in the record before us we can reach no other conclusion than that the board's purpose was not so exclusively restricted.

Respondent's action in denying the deduction of bequests to the Methodist Board of Temperance is approved.

The remaining question involved in the issue raised by the parties is whether or not respondent erred in denying also so much of the total deduction as was claimed in the estate tax return for bequests made to institutions other than the Methodist Board of Temperance, all of which other institutions the parties have stipulated qualified under the statute as religious, charitable or educational organizations. All of such special bequests have been paid in the sums provided in the will of petitioners' decedent, except the residuary trust estate, which is to be so paid upon termination of this proceeding.

Respondent denied the deduction for the reason that under the will of decedent her sister was given a limited power of appointment to "readjust" the amounts to be paid to the several named beneficiaries, and hence at decedent's death it was not known what amounts, if any, would ultimately be received by the tax-exempt donees. In this respect, we think, respondent did not err.

Deductions must be determined as of the date of death, *United States* v. *Provident Trust Co.,* 291 U. S. 272. It is immaterial, therefore, that decedent's sister survived her some two years and four months, and died without exercising her power of appointment. The value of the net estate, which is the basis for computing the tax, must be determined in the light of the facts and circumstances existing at decedent's death, and at that time it could not be known whether or to what extent decedent's sister would exercise her limited

power. "Tempting as it is to correct uncertain probabilities by the now certain facts", it can not be done. *Ithaca Trust Co.* v. *United States*, 279 U. S. 151, 155.

Undoubtedy decedent's sister, under the power given her, could in her will have "readjusted" the amounts of decedent's bequests so as to give to each of the admittedly religious, charitable, or educational organizations only a nominal amount and the balance of the total bequests to the Methodist Board of Temperance. In this situation, we hold that there existed at decedent's death no basis, ascertainable with reasonable certainty, for the computation of the value of any bequest deductible under the statute. *Francis L. Robbins, Jr., Executor*, 39 B. T. A. 599.

The deficiency determined by respondent is approved.

Reviewed by the Board.

*Decision will be entered for the respondent.*